# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01315-COA

**MARY CAROLE BRAND WATSON**                          **APPELLANT**

**v.**

**JOHN KEVIN WATSON**                                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 08/16/2018 |
| TRIAL JUDGE: | HON. JAMES CHRISTOPHER WALKER |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | J. MACK VARNER |
| | CLIFFORD C. WHITNEY III |
| ATTORNEYS FOR APPELLEE: | WILLIAM R. WRIGHT |
| | AMANDA JANE PROCTOR |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | REVERSED AND RENDERED - 06/02/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE J. WILSON, P.J., GREENLEE AND McDONALD, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. The Madison County Chancery Court granted Kevin Watson's request for a constructive-desertion divorce from Mary Carole Brand Watson. The chancery court also awarded Kevin a slightly larger share of the marital assets. Carole raises five issues on appeal, but we find that one dispositive conclusion largely obviates the need for further discussion. Because there was insufficient evidence to award a constructive-desertion divorce, we reverse the chancellor's judgment and render a judgment in Carole's favor. We also find no merit to Carole's claim that the chancellor should have recused himself.

## FACTS AND PROCEDURAL HISTORY

¶2. Kevin and Carole married during May 2007. They had no children together, but they each had adult children from their previous marriages. Kevin moved into Carole's house, and they later bought a vacation condominium in Orange Beach, Alabama. Although they were both practicing attorneys when they married, Carole stopped working a few months later.

¶3. In early December 2013, Kevin told Carole that he wanted a divorce. He moved out approximately a month later. In February 2014, Carole discovered that Kevin was involved in a new relationship.

¶4. In October 2015, Kevin filed a complaint for an irreconcilable-differences divorce. After Carole filed her answer,[1] Kevin amended his complaint. He claimed that he was entitled to a divorce based on Carole's constructive desertion or the irreconcilable differences that had arisen between them.

¶5. After fairly lengthy and sharply contested pretrial proceedings, the divorce portion of the trial occurred over the course of three days in early 2017. The chancellor ultimately granted Kevin's request for a constructive-desertion divorce. During two days in June 2018, the chancellor heard testimony regarding the division of marital assets. The chancellor awarded Kevin 54.7% of the marital assets, and Carole received the remaining 45.3%.

¶6. Carole appeals. She argues that the chancellor should have recused himself, two of his evidentiary rulings resulted in reversible error, and there was insufficient evidence to grant Kevin's request for a constructive-desertion divorce. Finally, she claims that the

---

[1] Although Carole initially filed a counterclaim for a divorce based on uncondoned adultery, she later withdrew her counterclaim.

chancellor improperly divided the marital estate.

## ANALYSIS

### I.     Constructive Desertion

¶7.     Regarding Carole's claim that the chancellor erred in awarding Kevin a constructive-desertion divorce, our standard of review is well settled:

> When reviewing a decision of a chancellor, this Court applies a limited abuse of discretion standard of review.  This Court will not disturb the chancellor's opinion when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied.  A chancellor's conclusions of law are reviewed de novo.

*Hoffman v. Hoffman*, 270 So. 3d 1121, 1126 (¶20) (Miss. Ct. App. 2018) (citations and internal quotation marks omitted).

¶8.     The chancellor found that Kevin was entitled to a constructive-desertion divorce because "many instances [of Carole's behavior] rise to the requisite level of conduct."  In so doing, the chancellor mentioned one specific incident that occurred during Kevin and Carole's March 2013 trip to the British Virgin Islands.  Otherwise, the chancellor found that Kevin was entitled to a constructive-desertion divorce due to "Carole's combative public outbursts" and "Carole's constant, and in many cases, irrational accusations against Kevin."

¶9.     The Mississippi Supreme Court has held that a constructive-desertion divorce is available under the following limited circumstances:

> If either party, by reason of such conduct on the part of the other as would reasonably render the continuance of the marital relationship unendurable, or dangerous to life, health[,] or safety, is compelled to leave the home and seek safety, peace[,] and protection elsewhere, then the innocent one will ordinarily be justified in severing the marital relation and leaving the domicile of the

3

other, so long as such conditions shall continue, and in such case the one so leaving will not be guilty of desertion. The one whose conduct caused the separation will be guilty of constructive desertion[,] and if the condition is persisted in for a period of one year, the other party will be entitled to a divorce.

*Benson v. Benson*, 608 So. 2d 709, 711 (Miss. 1992) (quoting *Day v. Day*, 501 So. 2d 353, 356 (Miss. 1987)). Said differently, "constructive desertion occurs when the innocent spouse is compelled to leave the home and seek safety, peace, and protection elsewhere because the offending spouse has engaged in conduct that would reasonably render the continuance of the marital relation, unendurable or dangerous to life, health or safety." *Hoffman*, 270 So. 3d at 1126-27 (¶24) (internal quotation marks omitted) (quoting *Griffin v. Griffin*, 207 Miss. 500, 505, 42 So. 2d 720, 722 (1949)).[2] "Chancellors should grant a divorce on the ground of constructive desertion only in extreme cases." *Id*. at 1127 (¶24).

¶10.    The case is not one of those extreme circumstances. One basis the chancery court used to grant Kevin a divorce occurred in March of 2013. Kevin testified that Carole must have drugged him one night during their trip to the British Virgin Islands "[b]ecause one minute [he] was fine, and the next minute [he] wasn't[,]" and Carole "always had Xanax and the drugs that she got . . . from her psychiatrist." Although Kathy Boyd, who was among the four other people on the trip, said she "felt like Kevin had been given something" because his state was inconsistent with the alcohol that he consumed, neither she nor Kevin testified

---

[2] "The line between . . . constructive desertion and . . . habitual cruel and inhuman treatment is blurred . . . ." *Hoskins v. Hoskins*, 21 So. 3d 705, 710 (¶21) (Miss. 2009). "[T]he only distinction" is that in a constructive-desertion case, one spouse "is compelled to leave and the [other spouse's] objectionable conduct continues for a year." *Id*.

4

that they saw Carole put anything in Kevin's drink.[3]  There was also testimony in the record that both Carole and Kevin often drank to excess.

¶11.   In addition to the insufficient evidence that Carole "drugged" Kevin on the trip, the March 2013 incident did not cause Kevin to leave the marital home.  He continued to live there after the trip.  Kevin did not tell Carole that he wanted a divorce until December 2013 and did not leave the marital home until approximately a month later.  Thus, Kevin endured the supposedly unendurable marriage for approximately ten months after the incident in the British Virgin Islands.

¶12.   As for Carole's "combative public outbursts," the evidence shows that during the seven years of their marriage, Carole once yelled at a restaurant staff, yelled at two women who cut past her in a line at a concert, and that she blurted out private marital details during a September 2013 dinner with friends.  Again, however, this does not constitute substantial credible basis to conclude that Kevin was compelled to leave the marital home.

¶13.   Kevin testified that the marriage first became unendurable for him during the summer of 2009 when Carole failed to adequately take care of herself, him, and the marital home.  Those were three provisions of their unwritten four-point agreement that they purportedly entered when she stopped working in the latter part of 2007.  Kevin also said that the marriage was unendurable because he and Carole "can't stand to be in the same room together.  I mean, it's just unhealthy [and] . . . stressful.  It's depressing."  But Kevin

---

[3] Although Kevin also testified that "there were other instances . . . where that very same scenario took place . . . ," he did not elaborate regarding when or how often those "other instances" occurred.

5

continued to live with Carole for years thereafter.

¶14.    As previously mentioned, our supreme court has commanded that constructive-desertion divorces are available only in "extreme" circumstances. *Lynch v. Lynch*, 217 Miss. 69, 81, 63 So. 2d 657, 661 (1953).  In one case, a constructive-desertion divorce was upheld where a wife ignored her blind husband's protests and frequently left him at his relative's house for days, left him without food during the week, and allowed her disrespectful grandson to live in the marital home for three years against his protests.  *Deen v. Deen*, 856 So. 2d 736, 737 (¶¶4-6) (Miss. Ct. App. 2003).  A constructive-desertion divorce was also available when a husband was subjected to his wife's false accusations of adultery several times a week for approximately ten years.  *Lynch v. Lynch*, 616 So. 2d 294, 295-97 (Miss. 1993).  But a constructive-desertion divorce is not a remedy when a husband merely says there is "no marriage" and "no relationship," and he began having an affair nearly one year before he left the marital home.  *Grant v. Grant*, 765 So. 2d 1263, 1267 (¶¶10-11) (Miss. 2000).[4]

¶15.    After a thorough review of the transcript and record, it is clear that Kevin became increasingly unhappy in the marriage because he felt as though Carole was not fulfilling her marital obligations to take care of herself, him, and the domestic sphere of the relationship. Carole certainly leveled many accusations against Kevin that were not borne out by the

---

[4] The chancellor acknowledged that Kevin and another woman had been involved in a clandestine and emotionally romantic relationship for several months before Kevin told Carole that he wanted a divorce.  Their relationship became physical approximately two weeks after Kevin finally left the marital home.  Kevin did not disclose his relationship to Carole before he left, but she discovered it a few months later.  The chancellor did not find that Kevin left Carole because he preferred to be with his paramour.

6

record. Suffice it to say, there was clearly a significant amount of mutual animosity by the time of the divorce trial years later. But it would be unreasonable to find that Kevin's abandonment of the marital home was the natural consequence of an alleged incident on a trip they took months earlier. *See Griffin*, 207 Miss. at 504, 42 So. 2d at 722. And it was undisputed that Kevin remained in the marital home for still another month after he told Carole that he wanted a divorce.

¶16. Notwithstanding the clearly acrimonious feelings between Carole and Kevin, the substantial credible evidence shows that "this case is yet another in our developing litany where . . . the problem [in the marriage] is [the couple's] fundamental incompatibility." *Day*, 501 So. 2d at 355. As such, this is not one of the "extreme cases" contemplated by our supreme court. It follows that we are compelled to reverse the chancellor's judgment.

## II.    Recusal

¶17. The dispositive nature of the previous issue would generally obviate the need to discuss any of Carole's other assertions. But due to the likelihood of further litigation before the chancery court, it is necessary to discuss Carole's claim that the chancellor erred when he denied her motion for his recusal.

¶18. Approximately six months into the current litigation, Pamela Hancock and Teri Gleason of the Hancock Law Firm PLLC (HLF) successfully moved to be substituted as counsel for Carole. Around four months later, Hancock and Gleason moved to withdraw, and Carole filed a pro se motion to terminate their representation. Carole alleged that HLF wrongfully retained money that she had given HLF to hold in trust. She further claimed that

HLF refused "to return files to [her]."

¶19.    At that time, the case was assigned to Judge Robert G. Clark III. He entered an order allowing Hancock and Gleason to withdraw, "reliev[ing them] of any further duties in this matter." A short time later, Carole moved for reconsideration. She said HLF still had not returned all of her files. Following a telephonic hearing, Judge Clark entered an amended order allowing Hancock and Gleason to withdraw. His amended order omitted language relieving them of further duties to Carole.

¶20.    That did not end Carole's dispute with HLF. She soon filed a pro se emergency motion for a preliminary injunction against HLF, and she alleged that HLF still had her files. Among Carole's claims against HLF and other scheduling and discovery disputes, Judge Clark decided to recuse to avoid the appearance of impropriety based on comments that he made during a telephonic hearing.[5] Judge Cynthia Brewer later recused on her own motion. In her recusal order, Judge Brewer assigned the case to Judge James C. Walker.[6] Judge

---

[5] Carole had filed a pro se motion for recusal claiming that all of the chancellors in the Eleventh Chancery District should recuse. Her motion was partially founded on the premise that chancellors elected partly by Madison County residents should not hear her claims against HLF because Hancock had been elected as the Madison County Prosecutor. Otherwise, Carole argued that none of the chancellors in the Eleventh Chancery District should hear "a matter in which both parties are resident Madison County attorneys" who "practice in Madison County[.]" Judge Clark did not recuse on either basis. In his October 24, 2016 order, Judge Clark opined that he could "be fair and impartial in presiding over this matter[.]" However, he decided to recuse because "a reasonable person could misunderstand . . . comments [that he made during a recent telephonic hearing] and come to the conclusion that [he] may be biased." Judge Clark also ordered the chancery clerk to "reassign the . . . cause to one of the other [c]hancellors" in the district. Thus, he clearly did not find that all chancellors in the district must recuse from the case.

[6] In all other sections of this opinion, we refer to Judge Walker as "the chancellor."

Walker's initial encounter with the parties occurred during a status conference. During that conference, Judge Walker entered an order on his own motion and severed Carole's claims against HLF from the divorce proceedings.

¶21. After the status conference, Carole filed a pro se motion for Judge Walker's recusal. We address her allegations in detail below. Judge Walker conducted a hearing on Carole's motion, but he ultimately denied her request. Carole petitioned for the Mississippi Supreme Court's review of Judge Walker's decision. *See* M.R.A.P. 48B. After ordering Judge Walker and Kevin to file responses, a three-justice panel denied Carole's petition for review.

¶22. On appeal, Carole reiterates her claim that Judge Walker should have recused. Citing *Allen v. Williams*, 914 So. 2d 254, 259 (¶20) (Miss. Ct. App. 2005), Kevin suggests that the issue is barred by res judicata because the Supreme Court upheld Judge Walker's decision. We disagree. The Supreme Court's March 2, 2017 panel order denied Carole's petition to review Judge Walker's decision that his recusal was unwarranted. Order, *In re Watson*, 2016-M-01518 (Miss. Mar. 2, 2017). Since the Supreme Court declined to review Judge Walker's decision, Carole's recusal claims are not barred by res judicata. *See Kinney v. S. Miss. Planning & Dev. Dist. Inc.*, 202 So. 3d 187, 194-96 (¶¶18-24) (Miss. 2016) (addressing a trial judge's refusal to recuse after previously declining to review a Rule 48B motion).

¶23. Carole notes that Judge Walker practiced with HLF before he took office on January 1, 2016. According to Carole, a fully informed reasonable person would question his ability to remain impartial after she asserted misconduct claims against HLF. Carole also characterizes events during the status conference and recusal hearing as though they were

indicative of Judge Walker's bias against her. She reasons that there was a "clear appearance of impropriety in [Judge Walker's] continuing to preside over" the divorce proceedings.

¶24. A trial judge's recusal decision is left to his "sound discretion" provided that "he applies the correct legal standards and is consistent in the application." *Latham v. Latham*, 261 So. 3d 1110, 1112 (¶7) (Miss. 2019). We presume "that a judge, sworn to administer impartial justice, is qualified and unbiased." *Kinney*, 202 So. 3d at 194 (¶20). To overcome this presumption, Carole was obligated to present "evidence of a reasonable doubt about the validity of the presumption." *Id.* There is reasonable doubt "when there is a question . . . whether a reasonable person, knowing all of the circumstances, would harbor doubts about the judge's impartiality." *Id.* (internal quotation mark omitted). "[M]ere speculation" is not enough to overcome the presumption. *Jackson v. State*, 1 So. 3d 921, 927-28 (¶18) (Miss. Ct. App. 2008).

¶25. We are not persuaded that Judge Walker should have recused from all proceedings involving Carole simply because she asserted misconduct claims against HLF. Carole's dispute with HLF arose while the divorce was still assigned to Judge Clark. By the time that the divorce case was reassigned to Judge Walker in late October 2016, Carole was acting pro se. Judge Walker immediately severed Carole's misconduct claims on his own motion, so he did not make any substantive rulings in that case. Judge Walker was not required to recuse himself from the divorce proceedings simply because he recused from the severed misconduct case on his own motion.[7] HLF was not a party to the divorce, and Judge Walker

---

[7] "[T]his Court certainly can take judicial notice of Supreme Court files." *Mitchell v. State*, 218 So. 3d 278, 283 (¶16) (Miss. Ct. App. 2017). Accordingly, we take judicial

had no pre-existing connection to Kevin or Carole—much less one that would raise reasonable doubts about his ability to remain impartial.

¶26.    We are also not convinced that Judge Walker should have recused himself based on his demeanor toward Carole during the status conference and the recusal hearing.  Carole's primary complaint was that Judge Walker did not allow her to comment before he decided to sever her claims against HLF from the divorce proceedings.  But Carole was on equal footing in that regard, as Judge Walker did not allow comments from anyone on the subject. While Kevin had filed his own motion to sever the claims, Judge Walker was unaware of it. In other words, we cannot find that Judge Walker's impartiality was in question based on his equal treatment of the parties.

¶27.    Regarding the recusal hearing, it is true that shortly after it commenced, Judge Walker told Carole, "Ma'am, if you interrupt me, you will be in jail.  Do you understand me?  We're five minutes in."  But Judge Walker went on to explain that he and Carole could not talk over one another due to "the decorum that must occur in a courtroom[.]"  Many of Judge Walker's admonitions centered on Carole's role as an advocate rather than a party.  For example, Judge Walker did not think it was necessary for Carole to read from the Mississippi Code of Judicial Conduct, so he instructed her to focus on the bases for her assertion that he must recuse himself.  It was certainly within his discretion to control the pace of the proceedings.

¶28.    Carole also notes that Judge Walker accused her of lying during the recusal hearing.

---

notice that the Mississippi Supreme Court appointed Judge J. Larry Buffington as a special chancellor to hear Carole's severed claims against HLF after all chancellors in the Eleventh Chancery District recused from that matter. Order, *Watson v. Hancock Law Firm*, 2016-AP-01698 (Miss. Dec. 9, 2016).

11

That occurred after Judge Walker found that Carole mischaracterized or inaccurately described events during the status hearing. The transcript provides no guidance as to the tone, emphasis, and inflection of Carole's and Judge Walker's voices, but it appears clear that the proceeding became contentious at times. In fact, Carole wanted "the record to reflect that Judge Walker yelled and shouted at [her]." At the same time, Judge Walker clearly thought that Carole was misrepresenting his—at that time—very brief involvement in the case, and that her assertions "impugn[ed] the integrity" of the court.

> The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards [a party] . . . . But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task.

*Liteky v. United States*, 510 U.S. 540, 550-51 (1994).

¶29. It is also noteworthy that Carole represented herself during the recusal hearing. Judge Walker clearly took issue with Carole's assertions, and he thought that some of them were disingenuous.

> [I]t is to be expected that there will from time to time be conflict between [judges and attorneys] in the course of their professional responsibilities. Judges are often called on to discipline attorneys and to criticize their conduct. Attorneys frequently challenge rulings of the judges. However, tradition and authority do not dictate that each time an attorney perceives the possibility that a judge may not think kindly of him he is entitled to have the judge removed from a case. On the contrary, unless the antagonism is extreme and clearly demonstrated, or unless the animosity so demonstrated is coupled with other prejudicial circumstances, recusal is not mandated.

*Washington Mut. Fin. Grp. LLC v. Blackmon*, 925 So. 2d 780, 788 (¶23) (Miss. 2004). We do not find that the conflict during the recusal hearing rose to the level of recusable

12

antagonism contemplated by the Supreme Court.

¶30. After carefully reviewing the totality of the circumstances, we agree that there was insufficient evidence to rebut the presumption that Judge Walker was qualified, unbiased, and impartial. Judge Walker did not abuse his discretion when he denied Carole's motion to recuse himself.

## CONCLUSION

¶31. After careful consideration, we find that the chancellor erred when he awarded Kevin a constructive-desertion divorce. Accordingly, we reverse the chancellor's judgment and render a judgment in favor of Carole. However, we are not persuaded by Carole's claim that the chancellor was obligated to recuse himself.

¶32. **REVERSED AND RENDERED.**

**CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. BARNES, C.J., NOT PARTICIPATING.**

13